IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| HARRIS METHODIST FORT WORTH | § | |
| | § | |
| VS. | § | ACTION NO. 4:01-CV-567-Y |
| | § | |
| SALES SUPPORT SERVICES, INC. | § | |
| EMPLOYEE HEALTH CARE PLAN and | § | |
| SALES SUPPORT SERVICES, INC. | § | |
| | § | |
| VS. | § | |
| | § | |
| TRANSAMERICA LIFE INSURANCE | § | |
| AND ANNUITY COMPANY, ET AL. | § | |

ORDER PARTIALLY GRANTING CROSS-MOTIONS FOR SUMMARY JUDGMENT

Pending before the Court is the Second Motion for Summary Judgment [document number 178] filed by plaintiff Harris Methodist Fort Worth ("Harris). Also pending before the Court is the Motion for Summary Judgment as to Harris [document number 186] filed by defendants Sales Support Services, Inc. ("Sales Support") and Sales Support Services Inc. Employee Health Care Plan ("the Plan"). After review of these cross motions, the related briefs, the evidence highlighted therein, and the applicable law, the Court concludes that both motions should be partially granted.

I.  Facts

Brenda Crosson was employed by Sales Support in Fort Worth, Texas, and was a participant in their employee health-care plan. The Plan is a partially self-insured employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").[1]  The Plan was part of the ProAmerica Preferred Provider Organization ("PPO") managed care

---

[1]The plan was self-insured up to $15,000, but Sales Support obtained third-party insurance to cover claims in excess of that amount.

network, which allowed its participants to receive discounted care from designated PPOs. Harris was a PPO for the Plan. Sales Support, as the Plan sponsor, administrator, and named fiduciary, reserved the right under the Plan to determine eligibility for benefits and to construe the Plan's terms. Berkley Risk Managers ("Berkley") served as Sales Support's third-party contract administrator.

On December 31, 1997, Crosson was admitted to Harris and gave birth to twins after only twenty-three weeks of pregnancy. When she was admitted, Crosson signed a "General Conditions of Treatment" form that assigned to Harris all rights to receive and enforce payment under the Plan for medical services provided to Crosson and the twins. The twins were hospitalized at Harris from December 31 to April 1, 1998, and their treatment from Harris during that period cost $666,931.89. The Plan paid the charges incurred by Crosson while at Harris, but paid nothing for Harris's services to the twins.[2]

Harris continued to seek benefits from the Plan for the twins' care, but when no payments were forthcoming for 110 days after it billed the Plan, Harris assisted Crosson in filing for Medicaid benefits.[3] Medicaid ultimately paid Harris $234,532.87 for the twins' care.[4]

---

[2]The Plan paid other providers for services rendered to the twins through March 1998, however, which payments apparently exceeded the $15,000 reinsurance deductible.

[3]Texas Medicaid requires that "[w]hen a Medicaid client has other health insurance, the other insurance must by billed by the provider before billing the Texas Medicaid Program." (Harris's App. [doc. 86] at 431.) The "110-day rule" provides that "[i]f a third party resource has not responded or delays payment or denial of a provider's claim for more than 110 days after the date the claim was billed, Medicaid will consider the claim for reimbursement." (Harris's App. [doc. 86] at 433.)

[4]Defendants' brief in support of its response to Harris's motion states that "Medicaid paid Harris $234,123.54" for services provided to the twins. (Defs.' Resp. Br. at 5.) In support of that statement, Defendants cite to the February 26, 2003, affidavit of Rachel Vasquez. In that affidavit, Vasquez

Thereafter, Harris filed this suit against Sales Support and the Plan.  In its capacity as assignee of the twins' claims, Harris seeks to recover benefits allegedly due the twins under the Plan.[5] *See* 29 U.S.C. § 1132(a)(1)(B).  Both Harris and Defendants seek a summary judgment on Harris's ERISA claim.

## II.  Summary Judgment Standard

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party moving for summary judgment has the initial burden of demonstrating that it is entitled to a summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party need not produce evidence showing the absence of a genuine issue of material fact with respect to an issue on which the nonmovant bears the burden of proof.  Rather, in that situation, the moving party need only point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmovant's claim.  *See id.* at 323-35.  Where, however, the moving party bears the burden of proof on the claim upon which it seeks summary judgment, it must present evidence that establishes "beyond peradventure *all* the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  When the moving party has carried its summary judgment burden, the

---

testifies that Medicaid paid "121,343.13" for Harris's services to Kaycee Crosson and "113,189.74" for Harris's services to Lacie Crosson.  (Defs.' App. [doc. 103] at 369).  It appears to the Court that the sum of these two figures is $234,532.87 rather than $234,123.54.

[5]Harris's second amended complaint also asserts a claim for Defendants' alleged breach of the managed-care contract, but neither summary-judgment motion addresses this claim.

nonmovant must go beyond the pleadings and by its own affidavits or by the depositions, answers to interrogatories, or admissions on file set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e).

In making its determination on the motion, the Court must look at the full record in the case. FED. R. CIV. P. 56(c); *see Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

### III.  Analysis

A.  Standard of Review of Denial of Benefits under ERISA

In reviewing an administrator's decision to deny benefits under an ERISA plan, the standard of review employed varies depending upon whether the ERISA plan vests the administrator with discretion to construe the plan's terms and make eligibility determinations. If the plan does not vest the administrator with such discretion, *de novo* review of his decision is required. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Conversely, where the plan vests the administrator with such discretion, the administrator's decision will not be overturned unless he has abused that discretion. *See Atteberry v. Mem'l-Hermann Healthcare Sys.*, 405 F.3d 344, 347 (5th Cir. 2005); *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287,

295 (5th Cir. 1999).

Where an administrator vested with discretionary authority under the plan is operating under a conflict of interest, however, less deference is required. *See Vega,* 188 F.3d at 299. In that situation, a "'sliding scale' is applied to the abuse of discretion standard." *Lain v. UNUM Life Ins. Co. of. Am.*, 279 F.3d 337, 343 (5th Cir. 2002). "The greater the evidence of conflict on the part of the administra- tor, the less deferential [the] abuse of discretion standard will be." *Vega*, 188 F.3d at 297. "When a minimal basis for a conflict is established, [a court] review[s] the decision with 'only a *modicum less* deference than [it] otherwise would.'" *Lain*, 279 F.3d at 343 (quoting *Vega*, 188 F.3d at 301).

In this case, the Plan grants to Sales Support discretionary authority to interpret its terms and make eligibility determinations.[6]

---

[6]Specifically, the Plan provides as follows:

> In carrying out their responsibilities under the Plan, Fiduciaries will have discretionary authority to interpret the terms of the Plan and Plan Document, even if the terms are found to be ambiguous, and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority will be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Harris's App. [doc. 87] at 644.) The Court notes that the last sentence of this paragraph purports to make applicable an arbitrary-and-capricious standard. In *Bruch*, the Supreme Court rejected the employer's argument that an arbitrary-and-capricious standard applied to all ERISA benefit determinations. 489 U.S. 109-115. In rejecting that standard as contrary to the trust law upon which ERISA was based and instead applying de-novo review, the Court noted that "[n]either general principles of trust law nor a concern for impartial decisionmaking . . . foreclose[] parties from agreeing upon a narrower standard of review." *Id.* at 115. The parties have not addressed whether this language of the Plan reflects an agreement that benefit determinations would be subject to the arbitrary-and-capricious standard or the extent to which that standard differs from an abuse-of-discretion standard. It appears that in the Fifth Circuit, however, the standards are identical. *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 635 n.7 (5th Cir. 1992) ("we detect only a semantic, not a substantive, difference in [the abuse-of- discretion] label and the 'arbitrary and capricious' label used in this case by the magistrate judge and the district court"); *Penn v. Howe-Baker Eng'rs, Inc.*, 898 F.2d 1096, 1100 n.2a (5th Cir. 1990) (noting that "the way to review a decision for abuse of discretion is to determine whether the plan committee acted arbitrarily or capriciously").

Consequently, an abuse-of-discretion standard is appropriate. Never-theless, Sales Support was both the insurer, at least in part, and the administrator under the Plan. A party that both insures and administers the plan is self-interested because he "potentially benefits from every denied claim." *Vega*, 188 F.3d at 295. Thus, a "modicum less deference" should be given to Sales Support's decision to deny benefits. *See id.*

Harris contends that de-novo review is required because Sales Support abdicated its discretionary authority under the Plan to Berkley, its contract administrator. Harris has presented evidence tending to demonstrate that Berkley conducted the business of the Plan, including deciding claims for benefits, without Sales Support's input. *See Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1388-89 (9th Cir. 1994) (concluding that "because we do not have an interpretation of the Plan by the Administrative Committee, to whom such authority was granted by the Plan, there is no appropriate exercise of discretion to which to defer"). The Court need not decide this issue, however, because under either de-novo review or the abuse-of-discretion standard, the decision to deny benefits for the reason articulated to Harris was a completely erroneous interpretation of the Plan; indeed, in denying benefits, Defendants simply did not rely on the terms of the Plan at all.

B. The Plan's Denial of Harris's Claim for Benefits

Harris contends that the Plan denied its claim for services rendered to the twins because the reinsurance carrier denied coverage. On February 10, 1999, John Nigro, Berkley's Employee Benefits Manager, sent a letter in response to Harris's counsel's demand for payment

indicating as follows:

> [W]e paid claims submitted up to the reinsurance specific
> deductible levels ($15,000 per individual) and submitted
> the amounts exceeding the specific deductible to Sales
> Support Services' reinsurance company, Transamerica Life
> Insurance and Annuity Company.  Transamerica has denied
> coverage, as per the attached letters dated September 18,
> 1998, and reaffirmed November 25, 1998.  It's our
> recommendation that you contact [Transamerica].

(Harris's App. [doc. 86] at 407.)  In response, Harris's counsel again

wrote to Nigro on February 22, notifying Berkley that the reinsurer's

decision was irrelevant:

> We are fully aware as to why the re-insurance carrier has
> denied funding of these claims.  However, we respectfully
> remind you that our grievance is not with the re-insurance
> carrier.  The mistakes made by the Plan and Berkley as the
> administrator of the Plan in their application for re-
> insurance are not a concern of ours.  Additionally, where
> the funding of these claims come from is also not our
> concern.

(Harris's App. [doc. 86] at 408.)  Nigro responded to this letter

on March 9:

> As outlined in our letter of February 10, 1999, Berkley
> Risk Managers serves as Third Party Administrator for Sales
> Support Services.  We administer their partially self-
> funded Employee Benefits plan.  All claims are adjudicated
> based on the employer's plan document.
>
> As it pertains to the referenced matter, we paid claims
> submitted up to the reinsurance specific deductible levels
> ($15,000 per individual) as per the plan document, at the
> plan sponsor's (Sales Support Services) direction.
>
> As you know, claims submitted (above the specific) to the
> Reinsurance Company . . . have been denied.

(Harris's App. [doc. 86] at 410.)  Additionally, Karen Herman, the

Plan's representative, testified that the reason Harris's claim was

denied was because Transamerica denied paying reinsurance regarding

the claim.[7]

Defendants have pointed to no provision of the Plan that permits them to deny a claim for benefits solely on the ground that their reinsurance carrier denied their claim for reinsurance.  The Court has discerned no such provision after reviewing the Plan.  Indeed, Herman admitted that the Plan did not contain such a provision, but that it simply was the Plan's policy not to pay until the reinsurer had paid.  Defendants' refusal to pay Harris's claim because their reinsurer refused to pay them simply was not authorized by the Plan. Whether the reinsurer paid was irrelevant in deciding Harris's claim for benefits for the twins' care under the terms of the Plan.

C. Crosson's Failure to Pay Premiums

Defendants now assert another basis for denying coverage for the twins' care: that Crosson failed to pay applicable premiums for the twins and that, as a result, the twins' coverage under the Plan terminated on February 11, 1998.[8]  The Plan provides that "[a]

---

[7]Specifically, Herman testified as follows:

Q. Do you know why the Plan denied the twins' claim?
A. Transamerica denied--declined paying it.
Q. Okay. So that's the reason the Plan didn't pay?
A. Transamerica declined it, yes.
Q. And that's the reason that Transamerica--that the Plan didn't pay?
A. Correct.

(Harris's App. [doc. 87] at 559-60.)

[8]Harris contends, without explanation, that under the Plan, a newborn's "coverage shall not be changed while the child is confined in the hospital." (Harris's Second Mot. for Summ. J. [doc. 178] at 6; Harris's Br. in Support of Second Mot. for Summ. J. [doc. 179] at 11.)  Thus, Harris urges that the twins' coverage remained in effect the entirety of their hospital stay.  In support of that position, Harris cites to pages 31-32 of the summary plan description and pages 23-24 of the Plan. (*Id.*)  Based upon these citations, the Court presumes Harris is referring to the Plan's "Effective Date Proviso," which provides:

In order for coverage to become effective on the date it is scheduled, a Dependent must not be confined to a Hospital.  If the Dependent is confined, then the Dependent's coverage will not go into effect until the day following the Dependent's discharge from the facility.  *The same limitations also apply to any scheduled*

Dependent's coverage under . . . the Plan will terminate upon the earliest of the following: . . . the end of the period for which the Employee last made the required contribution for such coverage, if Dependent's coverage is provided on a contributory basis (i.e., Employee shares in the cost)." (Harris's App. [doc. 87] at 631.) An amendment to the Plan issued on September 1, 1997, provided that

> If an employee fails to continue in active employment due
> to a medical leave of absence (sickness or disability),
> the employee may continue health care coverages. After
> an employee has been absent for six weeks, the employee
> must reimburse the company the twenty-five percent
> contribution toward the cost of coverage, as required by
> active employees.

(Defs.' App. [doc. 103] at 110.) Indeed, on April 23, 1998, Sales Support sent a letter to Crosson explaining this requirement and demanding payment of Crosson's portion of the premiums:

> As a courtesy to our employees, Sales Support Services,
> Inc. pays for your health insurance premium in full for
> the first six weeks leave of absence. After that time we
> ask that you pay for the share of the premium that would
> be deducted from your paycheck on a weekly basis. We have
> paid the premium through pay date 2/18/98 and now ask that
> you send a check for the weeks following at a rate of
> $17.20 per week in order for your health coverage to
> continue. A check for $206.40 will cover you for the
> entire time that you are on family medical leave.

(Defs.' App. [doc. 103] at 110-A.)[9] Crosson admitted that she knew that additional premiums were required for the twins to be covered under the Plan, and that she failed to pay any premiums after the

_____

*change in coverage or benefits.*

(Harris's App. [doc. 87] at 630) (emphasis added.) Fatal to Harris's contention,
however, is the note at the bottom of the proviso: "NOTE: This Effective Date
Proviso will NOT apply to: (1) a Dependent child born while the Employee is
covered under the Plan and who would otherwise have coverage effective on the
date of birth." (*Id.*)

[9]Defendants now contend that Crosson's coverage terminated on February 11,
1998. This contradicts the April 23 letter, which indicates that Crosson's
premiums were paid through February 18. Defendants fail to explain this
discrepancy; the Court notes, however, that six weeks past December 31, 1997 (the
date of the twins' birth), is February 11, 1998.

twins' birth.  (Defs.' Resp. App. [doc. 104] at 5, 8.)[10]

The problem with Defendants' argument, however, is that they failed to deny Harris's claim on this basis anytime during the administrative process.[11]  Indeed, the evidence indicates that the Plan paid claims for the twins' care to other providers through March 1998 and consistently attempted to get its reinsurers to pay so it could pay Harris's claim.  As a result, Harris argues that Defendants have waived this ground as a basis for denying its claim.  Though Harris's waiver argument is appealing, the Court concludes that it should not prevail.

ERISA specifically requires that a plan give notice of the reasons for the denial of a claim:

> In accordance with regulations of the Secretary, every employee benefit plan shall--
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

---

[10]Harris makes much of the fact that one hundred percent of Crosson's premium was paid by Sales Support, presumably to the Plan, during her leave of absence, even though she did not reimburse Sales Support her twenty-five percent portion.  Thus, Harris contends, the premium was paid and the twins' coverage remained intact for the entirety of her leave of absence.  Though Sales Support may have paid one hundred percent of the premium due, the Court does not believe that this fact precludes it from arguing that coverage nevertheless terminated under the terms of the Plan due to Crosson's failure to reimburse Sales Support for her portion of those premiums.

[11]The written denials of Harris's claim do not mention that Crosson's failure to pay premiums were a basis for the denial.  The Court notes, however, that Harris's attorney's February 22, 1999, letter to Nigro indicates that Harris's claim had been denied due to "lack of re-insurance funding *and upon lack of coverage*."  (Harris's App. [doc. 86] at 408) (emphasis added.)  Neither party has explained this statement, however, and Defendants have not highlighted any evidence tending to indicate that they gave written notification to Harris that its claim was being denied due to termination of coverage as a result of Crosson's failure to pay premiums.

29 U.S.C.A. § 1133 (West 1999).   The implementing regulations in effect during the relevant time required that

> the initial notice of a claim denial contain:
>
>> (1) The specific reason or reasons for the denial;
>>
>> (2) Specific reference to pertinent plan provisions on which the denial is based;
>>
>> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>>
>> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

*Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 128-29 (1st Cir. 2004) (quoting 29 C.F.R. § 2560.503-1(f)(2000)).   Indeed, the Plan specifically requires that written notice of a denial of a claim for benefits contain "the reason(s) for the denial [and] specific reference to the Plan provision(s) on which the denial is based." (Harris's App. [doc. 87] at 634.)   To the extent that Defendants contend Harris's claim was properly denied due to Crosson's failure to pay premiums, they failed to state this reason as a basis for their denial of Harris's claim or refer to a specific provision of the Plan justifying denial on that basis.

The United States Court of Appeals for the First Circuit was presented with a similar situation in *Glista v. Unum Life Insurance Company of America*, 378 F.3d 113 (1st Cir. 2004).   In that case, the insurer denied benefits both initially and on appeal on the ground that the claim was excluded under the policy's pre-existing condition exclusion.   *Id.* at 118-19.   After suit was filed, the insurer also argued that the claim was barred under another of the policy's exclusions.   *Id.* at 120.   The court concluded that the insurer had

"violated ERISA and its regulations by relying on a reason in court that had not been articulated to the claimant during its internal review." *Id.* at 130.  The court then discussed how various courts have handled this type of situation:

> In this context, no single answer fits all cases.  *See Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381 (2d Cir. 2002) (adopting a "case-specific" approach to these situations).  Courts have adopted a variety of remedies. Some courts have simply engaged in de novo, non-deferential review of the previously unarticulated reason.  *Matuszak v. The Torrington Co.*, 927 F.2d 320, 322-23 (7th Cir. 1991); *see also Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3d Cir. 2002); (where plan administrator provided no reason for denial, reasons provided for the first time in litigation reviewed de novo); *Mansker v. TMG Life Ins.*, 54 F.3d 1322, 1328 (8th Cir. 1995) (same).  Other courts have limited the grounds for decision to those articulated to the claimant by the plan administrator.  *See Halpin [v. W.W. Grainger, Inc.]*, 962 F.2d [685,] 696 [(7th Cir. 1992)].

> Some courts have held that the administrator waived defenses to coverage not articulated to the insured during the claims review process when the administrator had sufficient information to have raised those defenses if it so chose.  *Lauder*, 284 F.3d at 380-81; *Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998); *Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir. 1991).

> By contrast, other courts have held that state common law doctrines of waiver have no place in review of ERISA claims, *see White v. Provident Life & Accident Ins. Co.*, 114 F.3d 26, 29 (4th Cir. 1997), or that if such doctrines apply, they did not bar ERISA plan administrators, on the facts of those particular cases, from raising new bases for the denial of benefits in litigation.  *Farley v. Benefit Trust Ins. Co.*, 979 F.2d 653, 659-60 (8th Cir. 1992); *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 901 (7th Cir. 1993); *see also Juliano [v. The Health Maint. Org. of N.J., Inc.]*, 221 F.3d [279,] 288 [(2d Cir. 2000)](waiver not applicable where new argument involves existence of coverage rather than application of policy conditions).

> Still other courts have remanded to the plan administrator to consider new factual evidence or plan interpretations presented for the first time to the district court.  *See Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1014 (9th Cir. 1997) (en banc) (new plan interpretation); *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 393 (7th

Cir. 1983) (new factual evidence).

*Id.* at 130-131.   The court further noted that "Congress gave the federal courts a range of remedial powers" under ERISA and concluded that "this power encompasses an array of possible responses when the plan administrator relies in litigation on a reason not articulated to the claimant."   *Id.* at 131.

Ultimately, the court in *Glista* concluded that the insurer had waived the new ground for denial of benefits based upon several factors.   "First, traditional insurance law places the burden on the insurer to prove the applicability of exclusions."[12]   *Id.*   "Second, the Plan here expressly provides that participants 'must receive a written explanation of the reason for the denial' of benefits."   *Id.* at 132.   "Third, [the insurer], by claiming that it did raise the [second ground for exclusion during the administrative process], has taken the position that it had sufficient information to raise th[at exclusion] during the claims review process."   *Id.*   Finally, the court noted that the plaintiff was suffering from a degenerative disease that could be terminal and thus his "medical condition calls for resolving this controversy quickly."   *Id.*   Under these circumstances, the court concluded that the "'appropriate equitable relief' is to hold [the insurer] to the basis that it articulated in its internal claims review process for denying benefits."   *Id.*

This Court reaches the opposite conclusion based on the facts of this case.   Regarding the first factor mentioned in *Glista*, the Court notes that, under Texas law, "[t]he insured bears the initial

---

[12]The court noted that "[a]lthough background rules of state law are not controlling, they are reinforced here by ERISA's statutory command that the administrator articulate specific reasons for a denial of benefits." *Glista*, 378 F.3d at 131.

burden of showing there is coverage." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552-53 (5th Cir. 2004).  The second factor militates in favor of Harris's waiver argument, inasmuch as the Plan clearly required written notice of the reasons for the denial of Harris's claim.  The third factor favors neither party, as neither has highlighted any evidence tending to demonstrate when Sales Support and/or Berkley became aware that Crosson did not intend to pay her portion of the premium.  And, Sales Support did not ignore Crosson's obligation to pay premiums, given that it sent her a demand for payment of those premiums on April 23, 1998.  Finally, with regard to the fourth factor, the facts requiring an expedited decision that were present in *Glista*--the insured's degenerative and possibly terminal condition--simply are not present in this case.

The United States Court of Appeals for the Fifth Circuit has specifically concluded that waiver can apply in the ERISA context. *See Pitts v. Am. Sec. Life Ins. Co.*, 931 F.2d 351, 356-57 (5th Cir. 1991); *see also Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 381 (2d Cir. 1992) ("Of the circuits that have addressed the issue, only the Fifth Circuit has definitively held that waiver is a viable argument under ERISA.").  In deciding in *Pitts* that an employer had waived a requirement in the policy that the employer have a certain number of employees, the Fifth Circuit "conclude[d] that the proper approach is to focus on the unilateral action of the insurer in failing to raise at the outset a known *defense* to the claim." *Pitts*, 931 F.2d at 357 (emphasis added).  Here, Sales Support is not asserting a defense under the policy, but instead contends that the twins simply were no longer covered under the policy after February 11 due to Crosson's failure to pay premiums.

A similar situation arose in *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279 (2d Cir. 2000). In that case, the Second Circuit

> found that medical necessity was a required element of the policy under which the Julianos sought reimbursement, and that the Julianos had not proven their case on that point. 221 F.3d at 287-88. Looking to the state law case of *Albert J. Schiff Assocs. [Inc. v. Flack*, 417 N.E.2d 84, 87 (1980),] for guidance, we held that such a required element was analogous to whether underlying coverage existed at all, and thus could not be waived. *Id.* at 288. In *Albert J. Schiff Assocs.*, the court made a distinction between policy conditions, which could be waived by the insurer's conduct, and the parameters of the underlying coverage, 435 N.Y.S. 2d at 975, 417 N.E. 2d 84. The Court held that a claim of waiver could not be used to expand the policy so that the insured "extende[ed] its coverage to more than it originally bargained." *Id.* at 974-75. In the Julianos' case, to deem the defense of medical necessity to be waived, and thereby allow the Julianos to recover without proving an essential element of their claim under the policy, would improperly expand the coverage of that policy.

*Lauder*, 284 F.3d at 381; *see also Pa. Nat'l Mut. Cas. Ins. Co. v. Kitty Hawk Airways, Inc.*, 964 F.2d 478, 480-81 (5th Cir. 1992) ("[i]t is well-settled Texas law that the doctrines of waiver and estoppel cannot be used to create insurance coverage where none exists under the terms of the policy"). For similar reasons, this Court concludes that Defendants have not waived their argument that the twins' coverage under the policy terminated as a result of Crosson's failure to pay premiums, even though they did not assert that as a ground for denying Harris's claim in the administrative process.[13]   *See*

---

[13] The Court recognizes that the Fifth Circuit has held, as Harris points out, that "a post hoc rationalization for a decision to deny benefits is not equivalent to an administrator's exercise of its discretion." *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 397 (5th Cir. 1998). In deciding to permit the insurer to raise the "post hoc" ground for denial of the claim, however, the Fifth Circuit specifically noted that "[t]his is not a situation in which the administrator asserted one plan *exclusion* at the administrative level and trial counsel then bolstered the administrator's position before the district court with plan *exclusions*." *Id.* at 396. Here, Defendants' post-hoc ground for denial is not based upon a particular exclusion in the policy but instead upon whether coverage terminated under the terms of the policy.

*Glista,* 378 F.3d at 131 n.3 ("This court has held, in other contexts, that mere procedural irregularities under the [ERISA] regulations do not automatically entitle plaintiff to benefits."); *Butler v. Trustmark Ins. Co.*, 211 F. Supp. 2d 803, 807 (S.D. Miss. 2002) ("the court in *Pitts* plainly did not conclude that Pitts was entitled to continued coverage under [the] policy without an accompanying requirement that he pay premiums for coverage").

D.   Effect of Medicaid Payment

Regarding the Medicaid payment, Defendants initially contend that Harris does not have standing to sue because Crosson assigned her right to recover from the Plan to Medicaid.  In support of that position, Defendants proffer the February 26, 2003, affidavit of Rachel Vasquez, a "Program Specialist II for the Texas Health and Human Services Commission, the Texas state agency that presently oversees and administers [Texas Medicaid]." (Defs.' App. [doc. 103] at 368, ¶ 2.)  In that affidavit, Vasquez testifies that "[p]ursuant to an application for Medicaid assistance, . . . Crosson enrolled [the twins] in the Texas Medicaid program and thereby assigned all rights to recover [the twins'] Medicaid expenses from any third party to the Texas Health and Human Services commission."[14]  (*Id.* at ¶ 5.) Defendants do not present a copy of Crosson's application for Medicaid, however, which presumably would be the best evidence of this alleged assignment.[15]  In any event, inasmuch as Crosson had

---

[14]Vasquez signed another affidavit on March 26, 2003, apparently attempting to correct certain inaccuracies in the February 26, 2003, affidavit upon which Defendants rely.  *See* Harris's App. [doc. 110] at 824-26.

[15]Vasquez's second affidavit indicates that the alleged assignment from Crosson to Medicaid arose by statute rather than from a written document executed by Crosson.  *See id.* at 825, ¶ 8.  The Court presumes Vasquez is referring to section 32.033(a) of the Texas Human Resources Code, which provides that "[t]he

already assigned to Harris, upon her admission to the hospital, the twins' rights to recover from the Plan for those services, she could not subsequently assign those same rights to Medicaid. *See Univ. of Tex. Med. Branch at Galveston v. Allan*, 777 S.W. 2d 450, 452 (Tex. App.--Houston [14th Dist.] 1989, no writ) ("The assignor, after an unqualified assignment and notice to the obligor, generally loses all control over the chose and can do nothing to defeat the rights of the assignee."). Thus, Defendants' argument that Harris lacks standing based upon the alleged Medicaid assignment fails.

Defendants also contend that Harris is not entitled to any benefits for the twins' care due to its acceptance of payments from Medicaid. Defendants contend that Harris accepted Medicaid benefits as payment in full for the twins' care, and it cannot now seek to recover any additional amounts for such care from Defendants. Thus, in essence, Defendants contend that if they delay paying benefits long enough, such that a provider is compelled to file for Medicaid benefits under the 110-day rule, Defendants are no longer obligated to pay any benefits at all. The Court cannot countenance, and Defendants have not demonstrated their entitlement to, such an unjustified windfall.

In support of their contention, Defendants cite only the affidavit of Rachel Vasquez executed on February 26, 2003. *See* Defs.' Br. [doc. 204] at 9 & n. 35. In that affidavit, Vasquez testifies that "[u]nder Medicaid laws, rules, and regulations, Harris accepted the Medicaid payments for [the twins] as payment in full for the

---

filing of an application for or receipt of medical assistance constitutes an assignment of the applicant's or recipient's right of recovery from . . . personal insurance." TEX. HUMAN RES. CODE ANN. § 32.033(a) (Vernon 2001).

services rendered to each of them." (Def.'a App. [doc. 103] at 369).

Tellingly, Defendants do not cite any statute, regulation, or case demonstrating that once Medicaid payments are accepted, a provider may no longer pursue payment from the patient's insurance company. And, in her subsequent affidavit executed on March 26, 2003, Vasquez explains that when she executed the February 26 affidavit upon which Defendants rely, she did not "understand that [Harris] was attempting to recover from a group health plan and the [original] affidavit, therefore, is somewhat misleading." (Harris's App. [doc. 110] at 824, ¶ 4.) In the later affidavit, Vasquez avers that as a participating provider in Texas Medicaid, Harris "must accept Texas Medicaid payments for services as payments in full from Medicaid unless other group coverage is involved." (*Id.* at 825, ¶ 10.)[16] In that event, a provider "may pursue recovery of a greater amount [than was paid by Medicaid] from a primary payor and upon receipt of payment from the payor the provider may retain any amount in excess of the Medicaid payment" and "refund Texas Medicaid up to the amount Texas Medicaid paid." (Harris's Resp. App. [doc. 198] at 843, ¶¶ 10-11.)

Finally, Defendants contend that "the evidence of 'reasonable and customary' charges incurred by [Harris] are refuted by the evidence that it accepted payment from Medicaid as payment in full-- for just over a third of what it claims would be reasonable to bill to Defendant[s]." (Defs.' Resp. Br. [doc. 204] at 16.) Harris has submitted evidence that its charges for services to the twins were

---

[16]Additionally, the Court notes that attached to Vasquez's second affidavit are portions of the Texas Medicaid Provider Procedures Manual, which provides that "[i]f Medicaid makes payment for a claim and payment is received from another resource for the same services, a refund to [Medicaid] is required." (Harris's App. [doc. 110] at 824-25, ¶ 6 & ex. A.)

reasonable and customary. *See* Harris's App. [doc. 88] at 768-69.) Defendants have not highlighted any evidence tending to suggest that Medicaid's payment amount represents the reasonable and customary charge for the services performed.

E.   Prejudgment Interest, Attorney's Fees and Costs

Harris seeks summary judgment regarding whether it is entitled to prejudgment interest. An award of prejudgment interest furthers the purposes of ERISA. *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 n.11 (5th Cir. 1991). As a result, the Court concludes that Harris is entitled to prejudgment interest. The rate of that interest is determined by reference to Texas law. *See id.* at 984. Thus, Harris will be awarded prejudgment interest on its ERISA claim at a rate computed in accordance with section 304.003(c) of the Texas Finance Code.[17] *See id.* at 984-85 (affirming award of prejudgment interest computed in accordance with Texas law).

Under ERISA, it is within the Court's discretion to award a reasonable attorney's fee and costs. *See* 29 U.S.C.A. § 1132(g)(1) (West 1999). In deciding whether to award fees, the Court must consider:

(1) the degree of the opposing parties' culpability or bad

---

[17]That statute provides as follows:

(c) the postjudgment interest rate is:

(1) the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation;

(2) five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is less than five percent; or

(3) 15 percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is more than 15 percent.

Tex. Fin. Code Ann. § 304.003(c) (Vernon Supp. 2005).

faith; (2) the ability of the opposing parties to satisfy
an award of attorneys' fees; (3) whether an award of
attorneys' fees against the opposing parties would deter
other persons acting under similar circumstances; (4)
whether the parties requesting attorneys' fees sought to
benefit all participants and beneficiaries of an ERISA plan
or to resolve a significant legal question regarding ERISA
itself; and (5) the relative merits of the parties'
positions.

*Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.

1980).  None of these factors are decisive, "but together they are

the nuclei of concerns that a court should address in applying

[ERISA's attorney's fee provision]."  *Id.* at 1266.

After considering each of these factors, the Court concludes

that Harris should be awarded at least some of its attorneys' fees

and costs.  Regarding the first factor, Defendants' had no legal basis

for denying benefits for services rendered to the twins through

February 11, 1998.  Indeed, the only reason Defendants denied benefits

prior to the filing of this litigation was not based on the Plan at

all, but instead on the fact that Defendants' reinsurer would not

pay. Had Defendants followed the requirements of ERISA's implementing

regulations and the language of the plan--both of which required them

to identify the Plan provisions justifying the denial--they might

have realized that their denial based upon the reinsurer's decision

was not permissible.  Thus, the first 'culpability' factor weighs

in favor of awarding fees.

Regarding the remaining factors, Defendants have not pointed

to any evidence tending to demonstrate that they cannot satisfy an

award of fees.  Furthermore, an award of fees will deter others from

seeking to delay or avoid payment of benefits for reasons not even

remotely justified by the applicable plan's terms.  And, although

Harris's claim for benefits does not seek to benefit all participants

and beneficiaries of the Plan and does not address significant legal questions regarding ERISA, the relative merits of the parties' positions, at least regarding the payment of benefits through February 11, weighs in favor of awarding fees.

Harris has not sought summary judgment regarding the amount of those fees, so that issue will remain for a later date. Nevertheless, the Court will be exacting in determining the amount owed to Harris for its fees and costs. Initially, the Court has some question as to how much of Harris's fees should be recovered given that Defendants ultimately prevailed on Harris's claim regarding services rendered to the twins after February 11, 1998. *Compare Life Partners, Inc. v. Life Ins. Co. of N. Am.*, 203 F.3d 324, 325-26 (5th Cir. 1999) (concluding that ERISA plaintiff should not have been awarded fees incurred prior to the filing of the amended complaint in which it first asserted ERISA claims). Furthermore, Harris's counsel's "all-but-the-kitchen-sink" approach to this litigation has unnecessarily increased the time, and thus fees, expended by all parties in this case.[18]

### IV.  Conclusion

Harris's Second Motion for Summary Judgment [document number 178] is PARTIALLY GRANTED, in that Harris is entitled to recover from Defendants the amounts it billed for services rendered to the twins from December 31, 1997 through February 11, 1998.  Additionally,

---

[18]In that regard, and as noted by Defendants, (Defs.' Resp. Br. [doc. 204] at 1, n.2), Harris's counsel included in its briefs and appendix argument and documents that are simply irrelevant to the claims between these parties. *See id.* (referring to the reinsurance documents).  Indeed, eleven volumes of Harris's appendix constitute the entire medical record for the twins, (Harris's App. [doc. 89-99]) and none of these documents appear to have been specifically highlighted in Harris's briefs as supportive of either its motion or its response to Defendants' motion.

summary judgment is granted as to liability on Harris's request for attorney's fees, costs, and prejudgment interest regarding this claim.

Defendants' Motion for Summary Judgment as to Harris [document number 186] is PARTIALLY GRANTED to the extent it seeks summary judgment on Harris's claim for ERISA benefits for services rendered to the twins after February 11, 1998.

SIGNED September 7, 2006.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE